### BOWLES, Price Administrator, v. SUE'S SHOP.

### Civ. A. No. 933.

District Court, W. D. Louisiana, Shreveport Division.

Feb. 11, 1944.

Malcolm E. Lafargue, of Shreveport, La., Amos J. Coffman, of Dallas, Tex., and Talmadge Kinnebrew, James G. Palmer, and Wm. B. Phelps, all of Shreveport, La., for plaintiff.

O. W. & B. D. Bullock, of Shreveport, La., for defendant.

DAWKINS, District Judge.

The bill seeks to enjoin the sale of women's outer garments, such as coats, dresses and suits at prices in excess of $69.75 for coats, $35 for dresses and $49.95 for suits respectively. The answer admits sales in excess of those prices in all three categories, but defendant contends it was entitled to use a different method or basis to that asserted by the plaintiff.

The facts with respect to this business, as revealed at the hearing on the application for a preliminary injunction, are as follows:

J. E. Peyton, who owns the major interest in this business (a sort of partnership with a minor interest belonging to his sister-in-law, Mrs. Sue Peyton), had conducted a women's ready-to-wear establishment at this same location, 603½ Texas Street, in the city of Shreveport, for several years. About July 1, 1942, he sold it to one L. H. Jarvis of Oklahoma City, Okla., and went into the army. Having been discharged from the service, Peyton returned to Shreveport in January, 1943, and reacquired the business from Jarvis about February 1st of that year. The name was changed to Sue's Shop, and in March, Mrs. Sue Peyton went east and bought the types and grades of coats, dresses and suits, which she, as manager for another dealer, had been selling for some years. These articles were all of a better grade and more expensive than those handled by Jarvis, and the declared purpose of defendant was to cater to a higher class of trade. In the meantime, that is between purchase of the business from Jarvis and May 1st, Peyton continued business for the purpose of liquidating the stock which Jarvis had on hand. The store was remodelled and the

business as now conducted was commenced under the name of Sue's Shop, about May 1, 1943.

Plaintiff contends that it is the same business, within the meaning of the Maximum Price Regulations established under the statute, Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., and that the maximum prices at which such garments could be sold was the highest figure used between August 1 and December 31, 1941. There is no contradictory evidence to the point, that while defendant bought back the business establishment from Jarvis, he proceeded to liquidate the remaining stock on hand but intended and did engage in selling a higher type or grade of merchandise, that is, women's outer garments, mostly coats, dresses, and suits. The question is, could he do this at the same stand and after purchasing and liquidating the stock which Jarvis had on hand; or was he restricted to the same price ranges as his immediate predecessor? I daresay that, notwithstanding the fact he had been in the same kind of business at this stand before going into the army, if he and his sister-in-law, on his return, had decided to engage in business at some other point not connected with this location or establishment run by Jarvis, they could have done so and might have chosen any grade or class of merchandise which they saw fit, so long as the prices were within those fixed by the regulations for a new business. In the present case defendants, on the theory that they were starting a new business, set their prices according to those used by their "most closely competitive seller of the same class" of goods, provided by Section 1389.53 of MPR 330.

The whole purpose of price control legislation and the regulations established thereunder, was to prevent dealers from increasing or marking up their prices on the same classes and grades of merchandise above those for which they had sold over a fixed period preceding, to be known as the base period, and to induce continuation of the lower or popular price stores. Those not previously engaged in business were to be governed by the prices applicable to their competitors in the same kinds, classes and grades of merchandise. By this means, no one would be permitted to profit by the fact that the demand was greater than the supply and that customers earning large incomes, growing mainly out of the war, were willing to pay whatever was asked to get what they wanted, which, as is commonly known, provides the danger of inflation.

If it is a continuation of the same business, the base period applies to both the transferor and the transferee, who are "not permitted to sell any garment at a higher price" than the "highest price line" at which they "delivered a garment of the same 'category number' during the period which fixes" their "highest 'price line' limitation." MPO 330, Section 1839.552. What is meant by "category number" is that "each kind of garment (such as dresses, coats, suits and skirts) is broken down into certain size groups. Each size group is described as a category and given a 'category number'". See subsection 1389.552(b). The "highest price line" is explained in section 1389.553, and the dealer "may not under any circumstances sell any garment * * * for more than the highest selling price line at which" he "delivered a garment of the same category number either during" his "base period or during March 1942." This, necessarily, has the effect of freezing or restricting those already in business to the type and grade or class of goods, in so far as prices are concerned, which the dealer was handling when the regulations went into effect. Of course, we can only speculate as to the reason for this restriction but it would seem the most plausible one is that thereby the difficulties of keeping track of the operations of dealers would be minimized and would prevent some of them from marking up the prices on their stocks under the guise of new merchandise if they were permitted to add higher price lines.

If it be true that these defendants, in good faith, intended to start a new business of a different type for the handling of a better grade and higher priced line of merchandise, and their investment in the stock to be sold from and after May 1st was made accordingly, they doubtless have paid prices, which, if they are restricted to the ceiling applicable to Jarvis, as contended by plaintiff, would force them out of business. Nothing is suggested, however, in the pleadings or the argument to indicate that they were not in good faith or are selling at unreasonable prices when the cost of the goods is considered. I think it necessary that the plaintiff should establish a clear case before that result is brought about. At this stage, and until a hearing can be had upon the merits, at which all the facts may be fully developed, the court

is of the view that it should not continue the harsh effects of an injunction that might destroy the business. The Act contains penalties which may be invoked should it develop that there has been a wilful violation. It is undoubtedly necessary to have a firm and impartial enforcement of the price control law and regulations, if we are to avoid inflation and "black markets".

The preliminary injunction will be denied until the trial on the merits.